# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**LAKEITHDRICK HARRIS**

**CRIMINAL ACTION**

**NO. 17-68-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on the *Motion to Suppress* (Doc. 16) filed by Defendant Lakeithdrick Harris. The Government opposes the motion. (Doc. 21.) An evidentiary hearing on this matter was held on October 13, 2017. (Doc. 27.) After the transcript was filed into the record on November 13, 2017 (Doc. 28), both parties filed post-hearing memoranda (Docs. 29–30) and replies (Docs. 31–32). Further argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied.

## I.    Introduction

On May 17, 2017, the grand jury returned a two-count indictment against the Defendant. (Doc. 1.) He is charged with one count of possession of a firearm by a convicted felon and one count of possession of a stolen firearm. (*Id.*) Both offenses are alleged to have occurred on April 21, 2017. (*Id.*)

These alleged crimes and this motion center on a traffic stop that took place on the day in question. It is undisputed that the Defendant was driving a black Toyota Camry on Ardenwood with his girlfriend, Troymesia Cloud, and an infant when Corporal Jesse Barcelona initiated a traffic stop. After being joined by another officer, Barcelona conducted a search of the Camry

and found a firearm.  The Defendant was subsequently arrested and purportedly made incriminating statements.

Defendant seeks to suppress the weapon and statements as fruits of an unlawful search. The motion turns on two main questions: (1) whether Barcelona in fact saw pieces of marijuana in the vehicle so as to justify the search; and (2) whether Cloud, the registered owner of the vehicle, gave Barcelona consent to search.

In sum, having considered the record and the live testimony of the witnesses, the Court finds that Barcelona observed marijuana in plain view and thus had probable cause to search the Camry.  As a result, the automobile exception to the warrant requirement applies, and the Defendant's motion is denied.

## II.     Relevant Factual Background

### A.  Preliminary Note

Barcelona and Cloud were the only witnesses to testify at the hearing.  Their accounts differ greatly on the key issues, so the Court listened carefully to the testimony and conducted a thorough review of the record.  Aside from these witnesses, the Defendant submitted the narrative of Barcelona's incident report (Def. Ex. 1), and the Government submitted a video (without audio) of the traffic stop (Gov't Ex. 1).  Timestamps given throughout the opinion refer to this video.  The Court's review of the record is contained in the next two sections.

### B.  Testimony of Corporal Jesse Barcelona

#### 1. Barcelona's Background

Barcelona works with the Baton Rouge City Police Department ("BRPD"), and he has been with that organization for fourteen and a half years. (Hr'g Tr., 4, Doc. 28.)  During that time, he worked as a uniform patrolman for nearly five years, and he served with the K9 unit for

nearly seven years. (*Id.* at 4–5.) Currently, he is assigned to the street crimes unit, which "patrol[s] high crime areas and respond[s] to violent crimes in progress." (*Id.* at 5.) However, throughout his entire time with the BRPD, he has conducted traffic stops, but "a little bit more" while with the violent crimes unit. (*Id.*)

### 2. The Traffic Stop's Initiation

Barcelona testified that, on the day in question, he made a traffic stop of a black Toyota Camry in Baton Rouge on Ardenwood and Renoir, north of Florida Boulevard. (Hr'g Tr., 5, 24, Doc. 28.) Barcelona said his dash camera activates as soon as the lights in his police unit are turned on, so the video captured from before the point in which the car actually stopped until the end of the traffic stop. (*Id.* at 5–6.)

Barcelona stated that, prior to activating his lights, he "observed the front passenger lean over into the back seat, almost climbing over the top of it, and they were unrestrained; not in a seat belt." (Hr'g Tr., 6, Doc. 28.) After seeing this, Barcelona turned on his lights and performed the stop. (*Id.* at 6–7.) When watching the video, Barcelona noted that, between the start of the video and the 0:33 mark, the recording shows that "the front passenger turn[ed] around toward the back seat". (*Id.* at 7.) When Barcelona was later asked how he concluded that the front passenger was unrestrained, he testified: "the way she had leaned over and reached all the way to the back seat almost climbing over I guess you would say the top part [/] in between the seats right there." (*Id.* at 24.) Barcelona also said that the unrestrained child did not form the basis for the traffic stop at its inception, as he "did not see the child." (*Id.* at 35.)

Barcelona stated (correctly) that there was no sound in the video; he said that, "[f]or the most part," he "normally activate[s] sound when . . . conducting traffic stops", but, in this case, the mic that officers carry on their belt "was in [his] charging station." (Hr'g Tr., 7–8, Doc. 28.)

Barcelona testified that it was "probably" charged and capable of recording. (*Id.* at 26.) When asked if he "just neglected to put the microphone on [his] person so that [he] could record [his] interactions with the Defendant and with the passenger", Barcelona said, "Yes, I did not have it on my belt", even though it would have worked had he put it there. (*Id.* at 26.) Barcelona admitted that there was a department policy providing that "if it's available you need to have it on." (*Id.*)

Around the 0:44 mark of the video, Barcelona said that he was "advising the driver and the passenger [of] the reason for the traffic stop. Basically, [Barcelona] was able to identify why the passenger was leaning into the back seat. There was approximately an eight month old child unrestrained, no car seat, in the back seat." (Hr'g Tr., 8–9, Doc. 28.) The child was unbuckled and "just kind of laying on the back seat." (*Id.* at 9) Barcelona also said that, when he walked up to the vehicle, he did not see a seat belt on the passenger. (*Id.* at 25.) According to Barcelona, at the 1:13 mark of the video, "[t]he driver reaches back and grabs the child and pulls him up front with him." (*Id.* at 9.)

Barcelona said that, at the 1:30 mark, the "passenger had handed . . . his driver's license and the registration and proof of insurance . . . . to the driver and the driver [had] handed it to [Barcelona]." (Hr'g Tr., 9, Doc. 28.) At the 1:55 mark, Barcelona was "walking back toward [his] patrol unit." (*Id.* at 9–10.) Afterward, he determined that Ms. Cloud was the registered owner of the car, as she was leasing or subleasing it; the first registered owner was a business named Ride Now, Incorporated. (*Id.* at 9, 32, 37.) Barcelona stated that, at the 2:00 mark, he was "checking the registration and the driver's license on [his] police computer . . . to verify that [the car was] not stolen or anything of that nature." (*Id.* at 10.) Barcelona again stated later that he

did not run the license plate after he turned on his lights; he ran them "when [he] walked back to [his] vehicle to check the driver's license." (*Id.* at 29.)

When asked if there was "any insurance information or anything that came back on that vehicle when [he] ran that plate", Barcelona said "[i]t doesn't show insurance on [their] system." (Hr'g Tr., 30, Doc. 28.) Barcelona was also asked if they had "a special request for that," and he said, "No, we don't -- we usually just view from the . . . glovebox -- the paperwork correct. At some point it'll show if the vehicle's insured, it says yes or no, but to be honest with you that's not very accurate because somebody could have got insurance somewhere else." (*Id.*)

### 3. Marijuana in the Vehicle

Barcelona stated under oath:

Q:    Was there anything else that you observed during your initial approach to the vehicle when you were talking to the driver?

A:    Yes. When I was standing there talking to them, I was there for a few minutes, I observed several little small pieces of marijuana, some marijuana seeds and stuff of that nature throughout the vehicle and it basically appeared as if the vehicle had been smoked in on several occasions.

Q:    Did you detect an odor of marijuana?

A:    There wasn't really much of an odor, but I could just see the small pieces.

(Hr'g Tr., 11, Doc. 28.) This testimony is consistent with his narrative, which states: "While I was speaking with Harris and Cloud, I observed numerous small pieces of Marijuana throughout the inside of the vehicle." (Def. Ex. 1.)

When later asked where the marijuana pieces were located, Barcelona stated: "There were several throughout the vehicle. They were on the seats, the cup holders, the floor, stuff of that nature." (Hr'g Tr., 28, Doc. 28.) While Barcelona was standing outside the vehicle, he could not see it on the floor underneath where the driver was sitting or on the driver's lap, but, when

Barcelona "opened the passenger door that was one of the areas that [he] did see it." (*Id.*) Barcelona also said that the "pieces" were "just crumbs that fall out, seeds and stuff of that nature". (*Id.* at 28–29.) While Barcelona "could have collected and preserved it", he did not do so. (*Id.* at 29) Barcelona also admitted again that "there was no odor of freshly smoked marijuana in the car." (*Id.*) Barcelona later clarified that, as he "approached the vehicle and questioned the driver and the passenger of the vehicle", that was "the time frame when [he] observed the marijuana in the vehicle." (*Id.* at 35.) Barcelona stated that he has seen marijuana before and that he had no question as to whether it was, as he has "made hundreds of arrests for marijuana in [his] career." (*Id.*)

Barcelona said that, even without consent, he still would have searched the car "because of the marijuana [he] observed inside the vehicle." (*Id.* at 16.) Barcelona admitted, however, that, as of the date of the hearing, "we don't know what that material was" because "it was never analyzed" or "preserved." (*Id.* at 34.)

### 4. Purported Consent to Search

Barcelona testified that, at the 3:17 mark, he and Corporal David Kennedy approached the vehicle. (Hr'g Tr., 11, Doc. 28.) Kennedy was speaking with the driver and the child "for [Barcelona's] safety." (*Id.* at 12.) Barcelona was on the passenger side "[b]ecause [he] wanted to contact the passenger in reference to the seat belt violation and the unrestrained child." (*Id.* at 11.) Barcelona opened the door at the 3:25 mark "because [he] was going to have her step out and talk to [him]." (*Id.* at 12.) At the 3:53 mark, Barcelona took Ms. Cloud to the rear of the car "because [he] wanted to speak to her about the violation and [he] had just got[ten] her ID." (*Id.* at 12–13.") Barcelona said he did not speak to her inside the vehicle "because [he] wanted to ask

her about the little pieces of marijuana [he] had also observed in the car and see if she had any knowledge of that". (*Id.*)

 According to Barcelona, at the 4:26 mark, Ms. Cloud shook her head from side to side, and Barcelona says that he believed "at that point [he] asked her if she had any weapons or anything of that nature inside the vehicle." (Hr'g Tr., 13, Doc. 28.)  At the 4:30 mark, she shook her head up and down, and Barcelona said that, at this point, he "basically asked her if [he] could search the inside of the vehicle, if she minded if [he] searched." (*Id*.)  When Barcelona was asked if he had a standard approach to getting consent to search, he said: "I ask if they have anything inside the vehicle, any weapons or anything that I need to know about, and if they say no they don't, I ask if they'd mind if I take a quick look." (*Id.* at 13–14.)

Barcelona testified that, at the time Cloud gave consent, (1) there were no "threats made to her about issuing a citation or arresting her"; (2) neither his nor her voice were raised throughout the traffic stop; (3) she was not under the effect of prescription drugs, non-prescription drugs, or alcohol, and she was responsive to the questions asked of her; (4) he was able to understand Cloud's responses when he spoke to her; and (5) Cloud did not at any time "indicate to [him] that [he was] going to find a handgun or any other illegal items in the vehicle, and, in fact, she "seemed very surprised when [he] came out with the firearm." (Hr'g Tr., 17–18, Doc. 28.)

However, when Barcelona was asked if he advised Cloud "of the fact that she did not have to give consent", he admitted that he did not so advise. (*Id.* at 18.)  Barcelona also stated that he had with him written consent to search forms that were "readily available" to him when he discussed with Ms. Cloud the searching of her car, and the document advises the person in

writing "that they have a right not to consent to search." (*Id.* at 32.) Barcelona admitted that he

did not use that form in this case or inform her of her right not to consent. (*Id.* at 32–33.)

### 5. The Search, the Firearm, and Cloud's Reaction

At about the 5:03 mark, Barcelona opened the driver's side door, and he stated that this

was "to get the driver out of the vehicle so [he] could perform a search." (Hr'g Tr., 14, Doc. 28.)

Barcelona said that, "at this point the driver[/][D]efendant got fairly nervous and was asking

what the probable cause to search the vehicle was." (*Id.*) As the Defendant exited the vehicle,

Barcelona entered to "tak[e] a quick look on the inside[.]" (*Id.*)

Around the 5:40 mark, Barcelona exited the vehicle and put the Defendant in handcuffs.

(Hr'g Tr., 15, Doc. 28.) Barcelona testified that he did so:

> Because whenever I asked him to step out the vehicle I had asked if there was any
> weapons or anything right there, he said no, and when I located a weapon inside
> the vehicle it raised my suspicion of why it was located right next to him and he
> denied any knowledge of it.

(*Id.*) Barcelona said the weapon "was stuck in between the driver's seat and the center console",

and the infant "would have been directly over where the firearm was located." (*Id.*) Barcelona

said that, though he was looking in the inside of the vehicle when he first walked up to it "to see

if there were any weapons or anything in the car," he did not see the gun before then. (*Id.* at 28.)

Around the 6:22 mark, Barcelona re-entered the vehicle with black gloves on, and he

used the gloves "to try to preserve DNA or fingerprints." (Hr'g Tr., 15–16, Doc. 28.) He exited

the vehicle a few seconds later carrying a 40-caliber Springfield firearm. (*Id.* at 16.) Barcelona

testified that he told Ms. Cloud: "I thought you said you didn't have any weapons inside the

vehicle", and she replied that "she didn't know." (*Id.*) After unloading and securing the weapon,

Barcelona returned to speak with Ms. Cloud, and he testified:

She stated she didn't know that the firearm was inside the vehicle, that the driver had just picked her up a few minutes prior to this incident, her and the child, and she just had no knowledge of it. And due to her expressions and the way she was speaking I believed her.

(*Id.* at 17.)

### 6. Wrapping up the Traffic Stop

Barcelona said that Corporal Kennedy got the serial number from the gun "to run it through our criminal investigation unit." (Hr'g Tr., 19, Doc. 28.) The officers continued to search the vehicle for the next few minutes. (*Id.*) When asked if they found any evidence of criminal activity, Barcelona said: "There were several pieces of marijuana throughout the vehicle. It appeared the vehicle had probably been smoked in on several occasions and just, like I said, little seeds, little pieces on the floor, on the seats and stuff like that, but nothing that I would arrest somebody for." (*Id.* at 19.) After opening the trunk at around the 9:30 mark, and concluding the search thereof at around 10:00, Barcelona said that, because it was "kind of hot that day and [Cloud] had the child out in the sun," he told Cloud that she could re-enter the vehicle. (*Id.* at 20.)

Around the 11:15 mark, Barcelona returned to the police car. (Hr'g Tr., 20, Doc. 28.) He testified that, at that point, he *Mirandized* the Defendant and questioned him about the gun. (*Id.*) Barcelona said that, at that point, he knew that the Defendant had a prior felony conviction based on a criminal history that they ran. (*Id.* at 21.) Barcelona also stated that there was "an NCIC of the stolen firearm." (*Id.*) Barcelona said he did not threaten the Defendant during their interview of him. (*Id.* at 23.)

At the 14:50 mark, Corporal Kennedy was talking to Cloud while she was in the Camry. At this point, the Defendant was arrested, and the firearm was secured. (Hr'g Tr., 21–22, Doc. 28.)

Around the 15:50 mark, Cloud exited the vehicle. (Hr'g Tr., 21–22, Doc. 28.) Barcelona said that they had talked earlier about someone coming to bring her a car seat so that the child would not be "unrestrained leaving that location." (*Id.*)

At about the 15:59, Ms. Cloud approached the driver's side of the police car, and Barcelona said that he "advised her [he] was going to give her a verbal warning on the seat belt and the child restraint and [he] believe[s] [he] was allowing her to talk to the Defendant as well." (Hr'g Tr., 22, Doc. 28.) When asked why there was no arrest for the marijuana, Barcelona said, "It was just -- it's a misdemeanor. We have officer discretion and with the seriousness of the other case I didn't feel a misdemeanor -- anybody needed to be charged with a misdemeanor." (*Id.* at 36.)

The video continues until the 17:33 mark, with the last shot being Corporal Kennedy holding the infant and Ms. Cloud pulling the Camry to the side. (Gov't Ex. 1.) Barcelona said that "it [was] safe to say [that] at the end of the video the vehicle is parked [and] the traffic stop [was] over." (Hr'g Tr., 23, Doc. 28.)

### 7. The Narrative

Barcelona was also questioned about his BRPD Offense Report narrative, which contained his "observations and actions that occurred on scene." (Hr'g Tr., 31, Doc. 28; Def. Ex. 1.) Barcelona said that, though the document is not dated, "[n]ormally [he] write[s] [his] reports either that night or the next day." (Hr'g Tr., 31, Doc. 28.) The purpose of the report "is to document everything [he] observed and all the salient and important facts of [his] interaction with people that can subsequently lead to an arrest". (*Id.*) Though Barcelona states in his report that he advised Cloud that he "observed small pieces of Marijuana inside the vehicle (which is registered to her) and asked for consent to search it" and that "Cloud stated she didn't have any

10

weapons or any illegal inside the vehicle," he did not say in the report that she gave consent to search. (Hr'g Tr., 33, Doc. 28; Def. Ex. 1 at 1.)  Barcelona said, "I must have forgotten to write that down", though he admitted that this was an "important factor" and that a "consent to search . . . would normally go in [his] report." (Hr'g Tr., 33–34, Doc. 28.)

### C.  Testimony of Ms. Troymesia Cloud

#### 1. Cloud and the Defendant's Background

Cloud agreed that she was the registered owner of the black Toyota Camry stopped on the day in question. (Hr'g Tr., 38, Doc. 28.)  At that time, she and the Defendant lived together, and they had been dating for a year and a half. (*Id.* at 38, 46.)  Both were employed. (*Id.* at 38.)  Defendant helped Cloud pay the note on the car and insurance, and Defendant could drive the car any time he wanted. (*Id.* at 40, 46.)  Defendant used the car on a regular basis. (*Id.*)  Defendant helped with the operating costs of the vehicle. (*Id.* at 41.)  He also used the car to drive himself to and from his place of employment, at least on two occasions. (*Id.* at 41–42, 47.)  When he would do so, however, he would let Cloud know beforehand. (*Id.* at 47.)

#### 2. Beginning of the Traffic Stop and Seat Belt

Cloud also agreed that the Defendant was driving at the time of the traffic stop. (Hr'g Tr., 39, Doc. 28.) The infant in the car was the eight-month child of her cousin, and Cloud and the Defendant had been babysitting the infant. (*Id.* at 40–41, 47.)  When the stop occurred, Cloud and the Defendant were returning the child to his parents. (*Id.* at 40–41.)

Cloud testified that, when the officer turned on his lights, she asked the Defendant why he was turning, and he said the police had turned the lights on. (Hr'g Tr., 42, Doc. 28.)  She said that, at that time, the baby was asleep in her lap, and she had her seat belt on. (*Id.* at 42.)  Cloud stated that, when the car turned onto the street where the apartments were and when she moved

into the back seat between the seats before Defendant stopped it, she was "putting the baby in the back seat", and she had her seat belt on. (*Id.* at 43.)[1] Cloud said that it is possible for her to "move into the back seat with the seat belt on . . . because [she's] tiny and it moves . . . and the seat belt gives enough for [her] to do that[.]" (*Id.*)

Cloud later said at the hearing that the video shows her "leaning over and unbuckling [her] seat belt." (Hr'g Tr., 48–49, Doc. 28.) She stated: "I unbuckled [my seat belt] when he asked me to get out the car". (*Id.* at 49.) With respect to whether the car had a shoulder strap, Cloud testified that there was "a seat belt coming from what you'd call the center pillar . . . of the car and it went across [her] shoulder." (*Id.* at 50–51.) She said it was "at the level of her shoulder", and it is not visible from the video. (*Id.*) At the 3:51 to 3:54 mark (after the car was stopped), Cloud moved to the left and right, and she said that is when she unbuckled her seat belt. (*Id.* at 51.)

Cloud also testified concerning the beginning of the video, saying that, around the 0:14 mark, she reached into the back seat to put the baby there from her lap. (Hr'g Tr., 57, Doc. 28.) Cloud said that she was wearing her seat belt at this point, and she was "able to turn and move into the back seat with the baby on [her] lap . . . to put the baby in the back". (*Id.*) Cloud stated she was "belted the entire time". (*Id.*)

### 3. Consent to Search and Justifications for the Stop and Search

At the hearing, Cloud said that the following happened when the police officer "removed [her] from the vehicle":

> He asked me do I drive the car, does [Defendant] drive the car often. He told me -
> - he asked me -- he asked me did I have anything illegal in the car and I told him
> no, and then he asked me a couple more questions I can't remember. Then at the

---

[1] Cloud was likely referring to around the 0:22 mark of the video.

end of it he said if he were to search the car would he find any illegal things and I said no.

(Hr'g Tr., 43, Doc. 28.)  When asked to repeat her answer, she stated:

> He asked me did I drive the car often and did Lakeithdrick drive the car and he asked me whether anything illegal -- at the beginning he asked me was there anything illegal in my car and I said no, sir.  And at the very end -- his last question was if he were to search my car would he find anything and I said, no, sir.

(*Id.* at 44.)  Cloud testified that the officer never told her she had a right not to let him search the car. (*Id.*)  Moreover, she stated under oath that the officer never asked her if he could search the car, and she never told him, "Yes, you can search my car." (*Id.*)  Cloud also denied shaking her head up and down "as if [she] were giving him permission to search [her] car." (*Id.*)  Cloud expressly testified that Barcelona "search[ed] the car without [her] telling him he could search the car". (*Id.* at 44–45.)

When viewing the video, she later said that, at the 4:27 mark of the video, when she shook her head from side to side, Barcelona had asked her if there was anything illegal in the car, and, by shaking her head, she was "telling him that no there was nothing -- there was nothing illegal inside the car."  (Hr'g Tr., 53, Doc. 28.)  At that time, she did not know there was anything illegal in the car. (*Id.*)   At the 4:30 mark, she admitted to shaking her head up and down, and she said that was in response to Barcelona "asking [her] does Lakeithdrick drive the car often". (*Id.* at 54.)  She said it had "nothing to do with consent."  At the 4:33 mark, she shook her head up and down again, and Cloud said that this was not in reference to the Defendant driving the car. (*Id.*)  "It was something else but I can't recall." (*Id.* at 54.)  At the 4:50 mark, she shook her head from side to side, Cloud remembered that this was when "he said if I was to search your car would I find anything illegal, and I said no." (*Id.*)  About two seconds after this, she shook her head up and down, and Cloud said she "can't recall" why she did that. (*Id.*)

Cloud also stated at the hearing that Barcelona told her that he pulled her over because: "He said he ran my license plate and it said I didn't have any insurance"; according to Cloud, he never mentioned the seat belt. (Hr'g Tr., 47–48, Doc. 28.) However, when asked if "he mention[ed] anything to [her] at all about seeing some marijuana in the car", she replied: "I do not remember. I can't remember." (*Id.* at 48) Cloud was later asked what Barcelona said to her when he was on the passenger side and she was still sitting in the vehicle, and she said: "He was -- He asked me to step out the car. He asked how long I had my car and he asked for my ID and I can't remember -- well, I don't recall the rest of the conversation." (*Id.* at 51–52.) She was also pressed about when Barcelona told her that "he stopped [her] because he ran [her] plate and [she] didn't have insurance", and she answered: "It was at the very end of the stop when everything was getting all put together before I -- before I left I asked him what -- what was the reason I was stopped because I didn't get a ticket or anything." (*Id.* at 52.) She couldn't recall when this occurred, "but [she] kn[e]w it was at the end of it". She was not sure on whether it was "before or after [she] parked the vehicle", and she said: "I don't want to lie." (*Id.* at 53.)

Cloud acknowledged watching the video before the hearing and being in the courtroom when Barcelona was examined. (Hr'g Tr., 54–55, Doc. 28.) She stated that, at no time did she tell Barcelona not to search her car. (*Id.* at 55.)

### 4. Discovering the Gun

Cloud also viewed the point in the video in which Barcelona pulled the gun from the vehicle (around the 6:25 mark), and she said she had that facial expression because she "wasn't aware that it was -- I had illegal -- that in my car." (Hr'g Tr., 55, Doc. 28.) Cloud also stated that she said at that moment "Oh, my god", and she did so "[b]ecause, oh, my gosh, there's a gun in

my car" and because she was "surprised to know that there was a handgun" in her vehicle. (*Id.* at 56.)

Cloud also testified:

Q:     And he didn't threaten to arrest you; is that correct?

A:     When he got out -- when he was coming back with the -- when they came back and they was arresting him and stuff, he was asking me why did I lie to him and stuff and Lakeithdrick was asking -- telling him what was the problem? Why, you know -- why y'all on her, she don't really be in her car when they was arresting him.

Q:     But the officer didn't move to put you in handcuffs?

A:     No, sir.

Q:     And that was after he had searched the car?

A:     Yes, sir.

(*Id.* at 45.)

## III.     Discussion

### A.  Parties' Arguments

#### 1. Defendant's Memorandum in Support of Motion to Suppress (Doc. 16-1)

Defendant begins by stating that his "status as driver of a borrowed car gives rise to a legitimate interest of privacy that conveys standing to challenge the legality of the search." (Doc. 16-1 at 1.)  Defendant maintains that he had a "sufficient dominion and control over the vehicle to establish an expectation of privacy that would be understood by the general public, and thus should be recognized by the courts." (*Id.* at 1–2 (citation omitted).)  Defendant cites to certain cases recognizing a non-owner's privacy interests and authority to consent to search a vehicle,

and Defendant reasons that, by the same logic, a non-owner should have the right to object to an unconstitutional search.

Next, Defendant contends that, because the search was made in absence of a warrant issued by a neutral and detached magistrate, the burden shifts to the Government to prove that the stop was supported by probable cause and that the subsequent search falls under one of the established exceptions to the warrant requirement. Should the Government fail to adequately establish the constitutional validity of the stop and the search, this Court should, Defendant urges, suppress any statements or physical evidence obtained as a result of the search as "fruit of the poisonous tree."

## 2. United States' Response to Defendant's Motion to Suppress (Doc. 21)

The Government neither addresses nor contests standing. It does, however, concede that it has the burden of proving the legality of the search.

The Government then argues that the traffic stop was lawful under the two-prong *Terry* test. The traffic stop was justified at its inception because Barcelona identified a violation of Louisiana law justifying the stop of the vehicle when he saw the front passenger not wearing a seat belt. Additionally, the traffic stop was not unreasonable in scope or length because, as soon as Corporal Barcelona approached the car, he developed further reasonable suspicion of illegal activity upon observing the unrestrained infant and small pieces of marijuana in the vehicle. The Government argues the new reasonable suspicion was developed further when Barcelona questioned the passenger about the unrestrained seat belt and marijuana, and it culminated in the passenger providing consent to search the vehicle.

The Government next asserts that the warrantless search was justified by two established exceptions to the warrant requirement. First, the Government argues that the search was justified because the passenger, who was the registered owner of the vehicle, freely and voluntarily

provided consent to the search in accordance with the factors provided in *United State v. Morales*, 171 F.3d 978, 982–83 (5th Cir. 1999). Second, the Government argues that, because Barcelona possessed probable cause to search the vehicle as soon as he saw small pieces of marijuana throughout the vehicle, the search was lawful pursuant to the automobile exception.

### 3. Defendant's Post Hearing Memorandum in Support of Motion to Suppress (Doc. 29)

Defendant asserts that "the Government cannot prove consent was ever given at all, much less that it was given freely and voluntarily." (Doc. 29 at 2.) Defendant argues that the "fundamental purpose of the exclusionary rule is to compel law enforcement to adhere to settled constitutional principles." (*Id.* at 3.) While the exclusionary rule should not be used when an officer's violations are "either minimal or made in good faith", here, "the errors made by Cpl. Barcelona were so pervasive and insupportable that the community interest in rectifying his behavior far exceeds any interest in penalizing Mr. Harris." (*Id.* at 4.)

Defendant focuses on the multiple errors made by Barcelona, stating: "Although it is impossible to tell whether these errors were made with malice or as a result of basic incompetence, it is clear that Cpl. Barcelona knew the proper procedures and repeatedly failed to adhere to his training." (*Id.*) Defendant specifically cites to: (1) the failure to use the audio recording device, despite BRPD policy; (2) the failure to use written consent forms; and (3) the omission from his narrative report of the alleged fact that Cloud gave consent to search. Defendant argues that the Government cannot meet its burden of proof.

Defendant also maintains that the Government cannot prove probable cause to search independent of the purported consent. This argument centers on the marijuana allegedly in the vehicle. Defendant says (1) Barcelona did not smell any marijuana; (2) "he did not pick up any of the alleged marijuana, either for immediate field testing or to preserve it for later laboratory

analysis"; and (3) he did not "describe what he saw, beyond saying it was seeds and crumbs". (Doc. 29 at 6.)   Defendant cites to a few cases purportedly involving similar grounds. Defendant argues that the Court has nothing but Barcelona's "personal conclusion that the debris on the floor of the car was marijuana", and that "offends the most basic principle of justice." (*Id.*) Barcelona claimed he did not preserve the alleged marijuana because it was a "minor charge compared to the firearm possession," but allowing this justification "creates a monstrous loophole in the Fourth Amendment protections enjoyed by American citizens.   Police officers would be able to search any vehicle without restraint, needing only to claim they saw something they thought was an illicit substance." (*Id.* at 7.)

Defendant concludes by again summarizing Barcelona's "repeated errors and procedural failures": (1) he did not wear a mic; (2) he did not use a consent form; (3) he omitted the alleged consent from his police report; and (4) he did not preserve the marijuana debris.  Defendant states that this "gross deviation from accepted procedures" warrants the application of the exclusionary rule.

### 4. Government's Post-Hearing Memorandum in Opposition to Defendant's Motion to Suppress Evidence (Doc. 30)

The Government argues that the "primary focus of the evidentiary hearing was on whether there was lawful consent granted to search the vehicle, and the significance of the fact that Cpl. Barcelona did not advise Ms. Cloud of her right to refuse consent or provide her with a consent to search advisement form." (Doc. 30 at 4.)   The Government quotes the following non-exclusive six-factors used by the Fifth Circuit in determining whether consent is voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014) (citation omitted).  The Government correctly notes that "[n]o single factor is dispositive," *id.*, and that the issue of whether consent was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2048, 36 L. Ed. 2d 854 (1973).

Looking at these factors, the Government contends:

(1) "Cloud was not in custody at the time she gave Cpl. Barcelona consent to search her vehicle." (Doc. 30 at 5.)  They were talking at the rear of her vehicle, and Barcelona held Cloud's driver's license for less than a minute before she consented.  She was not restrained, and the video merely shows an ordinary traffic stop.

(2) "There was no evidence . . . that Ms. Cloud was subject to coercive police procedures before giving consent to search her vehicle, or at any other time." (Doc. 30 at 6.)  The Government asserts that the "discussion leading up to Ms. Cloud granting consent to search was cordial and non-confrontational", and, according to Cloud, the Government says, Barcelona was only forceful after discovering the weapon. (Doc. 30 at 6–7.)

(3) "The video again speaks for itself" that Cloud was "completely cooperative with law enforcement throughout the traffic stop." (Doc. 30 at 7.)

(4) The Government concedes that no consent to search form was provided and that Barcelona did not advise Cloud of her right not to consent.  But the Government says that the "Supreme Court has held that police officers are not always required to inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." (*Id.* (citing *United States v. Drayton*, 536 U.S. 194, 206 (2002)).)

(5) There is no evidence in the record of Cloud's education, though Barcelona stated that "she was responsive to his questioning and did not appear to be under the influence of drugs or alcohol." (Doc. 30 at 8.)  Cloud was also responsive to questioning at the hearing and seemed to understand it.

(6) "[A]t the time she gave Cpl. Barcelona consent to search the vehicle, Ms. Cloud did not believe that anything illegal would be found during said search." (Doc. 30 at 8–9.)

The Government argues that the sole factor in the Defendant's favor—the lack of advice about declining consent—is not enough to override the other five factors and the totality of the circumstances.  Consequently, neither the gun nor the Defendant's statements should be suppressed.

### 5. Defendant's Response to the Government's Post-Hearing Memorandum (Doc. 31)

The Defendant begins by emphasizing that it is the Government's burden to prove an exception to the warrant requirement.   Defendant correctly argues that the Government relies on "two grounds [for] justifying the search of the automobile: consent given by Ms. Cloud, . . . and independent probable cause established by the presence of marijuana in the vehicle." (Doc. 31 at 1.   Defendant contends that neither of these exceptions applies.

Concerning consent, the Defendant asserts that the "Government's entire legal analysis requires [the] Court to presume that the consent was given simply because Cpl. Barcelona claims Ms. Cloud nodded her head in assent when he asked." (Doc. 31 at 2.)  Defendant again discusses Barcelona's deviations from conduct, including the failure to use the audio recording and consent form, the failure to include the consent in his written narrative, and the failure to preserve the marijuana.  Defendant also emphasizes again that the purpose of the exclusionary rule is deterrence.

Defendant urges the Court to reject the Government's attacks on Cloud's credibility and cites to Supreme Court case law noting a police officer's bias with regard to his own cases. (Doc. 31 at 3 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 450, 91 S. Ct. 2022, 2029 (1971)).)  Defendant states that, with fourteen years of experience, Barcelona should have known about the need to verify consent and the existence of marijuana, "yet he offers no explanation for his inability to secure the necessary proof of either claim." (Doc. 31 at 3.)

Defendant also argues that the Court should reject the Government's other justification for the search: Barcelona's "hasty conclusion" that there was marijuana. (Doc. 31 at 4.) Defendant advances again the following reasons: Barcelona gave no description of the "debris he saw with any degree of detail", and "[h]e flatly denied smelling marijuana in the car." (Doc. 31 at 4.) Defendant asserts:

> It is not clear why Cpl. Barcelona allowed a vehicle to be driven away containing pieces of what he believed to be an illegal substance so large that he purportedly could identify them by sight while standing outside of a vehicle looking in through a window. It is clear, however, that allowing law enforcement personnel to simply decide that an illegal substance is present without having to offer any sort of proof of this fact violates the soul and substance of the Fourth Amendment protections provided by our great Constitution.

(Doc. 31 at 4.)

Defendant states that "Barcelona's gross deviations from established departmental procedure must not be permitted to stand, as 'illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.' " (Doc. 31 at 5 (citing *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 535 (1886)).) Because the Government cannot meet its burden, Defendant says, the evidence and statements should be suppressed.

### 6. Government's Response to Defendant's Post-Hearing Memorandum in Support of Motion to Suppress Evidence (Doc. 32)

The Government begins its memo by saying that, in his briefing, "defendant equates a violation of [BRPD] regulation to a violation of the Fourth Amendment that gives rise to the exclusionary rule." (Doc. 32 at 1.) The Government argues that the exclusionary rule is intended for those cases where "law enforcement, in conducting a search, has substantially and deliberately violated a Fourth Amendment right, and not a police department regulation." (*Id.*) While the Government concedes that a violation of a departmental regulation can be considered

in weighing Barcelona's credibility, the Government states that the Court has "considerable additional evidence (i.e., the video of the traffic stop and the entirety of Barcelona's testimony during the October 13, 2017, hearing) to consider when evaluating said testimony." (Doc. 32 at 2.)

The Government also maintains that Defendant's focus on one of the six consent factors (to the exclusion of the other five) contradicts the above-cited case law stating that "[n]o single factor is dispositive" and that the Court should look at the totality of the circumstances. (Doc. 32 at 2 (citations omitted); *see, supra*).

Lastly, the Government attacks the Defendant's argument that the automobile exception is only applicable "when, in cases involving controlled substances, probable cause to search is developed after the fact". (Doc. 32 at 2.)  The Government says this "is contrary to the automobile exception itself, i.e., "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle **without more**". (Doc. 32 at 2 (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)).)  Further, under Fifth Circuit case law, "[w]hether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed 'in light of the observations, knowledge and training of the law enforcement officers involved in the warrantless search." (*Id.* (citing *United States v. McSween*, 53 F.3d 684, 687 (5th Cir. 1995) (citing *United States v. Munis-Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990))).)  The Government argues that, even if no contraband had been found, that would not make the search unlawful.  "In addition, since Barcelona's search of the vehicle resulted in the seizure of an unlawful firearm, and not additional marijuana, the search similarly is not rendered unlawful." (Doc. 32 at 3.)

Ultimately, the Government says, Barcelona's "failure to seize and test the marijuana involves due process under the Fifth Amendment, and not a factor to be considered when determining whether Barcelona had probable cause to conduct a warrantless search of the vehicle." (Doc. 32 at 3.) That is, if Barcelona had arrested the Defendant for possessing marijuana and then failed to preserve the evidence, then there would be a potential due process violation; however, "Barcelona's exercise of discretion not to seize the substance that he believed to be marijuana . . . can result in no inference of a due process violation, since he was under no obligation to seize the substance in order to pursue firearm charges against defendant." (*Id.*)

### B. Analysis

#### 1. General Principles

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653–654, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). Accordingly, "the Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

"While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). The Fifth Circuit has stated that one situation in which the burden shifts to the Government is when a defendant shows that he was subject to search without a warrant. *Id.* Consequently, in the instant case, where Defendant has established standing (and the Government does not contest it) and the facts are undisputed that he was subject to a warrantless search, the Government bears the burden of proving the legality of the stop and the warrantless search by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S. Ct. 988, 996, 39 L. Ed. 2d 242 (1974).

## 2. The Automobile Exception

Under the "automobile exception," "in cases where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*" *Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999) (per curiam) (emphasis in original) (quoting *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)). "A warrantless search is permissible under the automobile exception if (1) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (2) exigent circumstances justified the search." *United States v. Berry*, 664 F. App'x 413, 420 (5th Cir. 2016) (per curiam) (quoting *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (alteration in original) (quoting *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir. 1986))).

### a. Probable Cause to Search

Concerning the first prong, "[p]robable cause to search an automobile exists where 'trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband'." *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc)). "A determination of probable cause is also based on the totality of circumstances and must be predicated on more than a 'bare suspicion.' " *United States v. Guerra*, 605 F. App'x 295, 297 (5th Cir. 2015) (citing *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)). However, "if, under the totality of the circumstances, officers have probable cause to believe that a vehicle contains contraband, they are authorized to search [it] without a warrant." *United States v. Sinisterra,* 77 F.3d 101, 105 (5th Cir. 1996) (citations omitted)). "Whether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed 'in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search.' " *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (quoting *United States v. Muniz–Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990)). The Fifth Circuit has stated that, once a vehicle is lawfully stopped, the observation of contraband in plain view furnishes the requisite probable cause for a subsequent search of the vehicle. *United States v. Lara*, 517 F.2d 209, 211 (5th Cir. 1975).

Turning to the facts of the instant case, the Court must resolve the central question: did Barcelona see marijuana in the vehicle? Having listened to Barcelona's testimony, observed him in open court, and reviewed the video and written transcript and narrative, the Court finds that he did.

The Court recognizes that both Barcelona and Cloud have some bias. As the Defendant contends, Barcelona has an interest in his investigation, and, as the Government contends, Cloud has an interest in protecting her long-time boyfriend who provides financial support.

However, the Court finds that Barcelona's testimony was more believable than Cloud's. Nearly all of Barcelona's account appears consistent with the video recording, particularly with respect to his conversation with Cloud and her reaction to the weapon. (Hr'g Tr., 15–18, Doc. 28.) Moreover, Barcelona has fourteen years of experience in law enforcement and has dealt with marijuana in "hundreds of arrests . . . in [his] career" (*Id.* at 35); the Court believes him highly capable of recognizing it when looking into a vehicle. Lastly, Barcelona's written narrative, which is typically drafted the night of a stop or the following day, also references the marijuana, and this provides further proof supporting his memory. (Hr'g Tr., 4, 35, Doc. 28; Def. Ex. 1.)

Defendant passionately argues about the many missteps in Barcelona's procedure, such as the failure to use the consent form and audio recorder and the failure to include Cloud's consent in the narrative. But the Court credits Barcelona for candidly admitting these failures without fencing.[2] (Hr'g Tr., 7–8, Doc. 28) This contrasts starkly with Cloud, who claimed not to remember (1) whether Barcelona asked her about marijuana, (2) what she shook her head about, and (3) other parts of her conversation with Barcelona. (Hr'g Tr., 48, 51–54, Doc. 28) The Court finds all of these memory lapses highly unbelievable.

---

[2] For example, Barcelona admitted that the audio recorder was "in [his] charging station." (Hr'g Tr., 7–8, Doc. 28) Barcelona acknowledged that the microphone was "probably" charged and capable of recording, and when asked if he "just neglected to put the microphone on [his] person so that [he] could record [his] interactions with the Defendant and with the passenger", Barcelona said, "Yes, I did not have it on my belt", even though it would have worked had he put it there. (*Id.* at 26.) He further acknowledged violating the departmental policy on this. (*Id.*) Barcelona also admitted that he did not advise Cloud that she did not have to give consent to the search (*Id.* at 18, 32–33), a fact which he could have denied given the lack of audio.

Ultimately, the Court concludes that, under the totality of the circumstances of this case, on the record as it now exists, with respect to credibility, Barcelona's honest acknowledgement of his procedural shortcomings weighs as much in his favor as against. The Court believes this to be particularly true since (1) as the Government argues, violations of police regulations do not necessarily equate to violations of the Fourth Amendment; (2) the Court does not find Barcelona's procedural mistakes to have been made deliberately or in bad faith; (3) Barcelona's candid admission that there was no smell of marijuana odor in the car—which alone would have justified the search, *see McSween*, 53 F.3d at 686–87 (collecting cases)— lends a great deal of credibility to his testimony (Hr'g Tr., 29, Doc. 28); and (4) Barcelona's decision not to arrest the Defendant *and Cloud* for the misdemeanor drug possession (which would have necessitated seizure of the marijuana) was reasonable under the circumstances. (Hr'g Tr., 19, 36, Doc. 28) All of this, combined with the Court's observation of Barcelona at the hearing, leads the Court to believe his testimony about the marijuana.

In sum, Barcelona's observation of small pieces of marijuana throughout the vehicle provided him with probable cause to believe the vehicle contained contraband, satisfying the first requirement of the automobile exception.

### b. Exigent Circumstances

The Government also meets the second prong of the automobile exception requiring exigent circumstances by virtue of the vehicle's potential mobility. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Dyson*, 527 U.S. at 467, 119 S. Ct. at 2014 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996) (per

curiam)); *Sinisterra*, 77 F.3d at 104 ("a finding of exigent circumstances other than the fact of the automobile's potential mobility" is not required for the automobile exception to apply).

Here, the vehicle clearly remained potentially mobile. Indeed, the Defendant does not contest this element of the automobile exception. Thus, both requirements of the automobile exception apply, and the search was lawful.

### 3. *Terry* Stop Analysis

#### a. Introduction and First Element of *Terry*

In his opening memorandum, the Defendant briefly raised the question of the legality of the stop itself, and, in response, the Government briefed the *Terry* requirements. Defendant makes no mention of *Terry* in post-hearing memoranda, and the Court is not sure if the Defendant still contests it. Nevertheless, out of an abundance of caution, the Court will address the issue. In short, the Court finds that the Government has satisfied the requirements of *Terry*.

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). *Berry*, 664 F. App'x at 418. *Terry* articulated a two-part test, which asks: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20); *see also*, *e.g.*, *United States v. Fajardo-Guevara*, 507 F. App'x 365, 366 (5th Cir. 2013) (per curiam) ("The legality of a traffic stop is examined under the two-pronged analysis described in *Terry*[.]); *United States v. Castro*, 480 F. App'x 782, 784 (5th Cir. 2012) (same).

Here, Barcelona's traffic stop was justified by his observing the front passenger lean into the back seat without a seat belt. (Hr'g Tr., 6–7, 24, Doc. 28.)   As discussed above, the Court finds Barcelona's testimony more believable than Cloud's.  To reinforce this, the Court credits Barcelona for honestly admitting that the unrestrained child did not form a basis for the traffic stop, as he "did not see the child" at that time. (*Id.* at 35.)  Further, the Court finds that the video (particularly the 0:14 mark, where Cloud leans into the back seat, and the 3:41 to 3:54 mark, where Cloud leans over to get out of the car) appears to show, more likely than not, that Cloud was not wearing a seat belt.  Thus, the first *Terry* requirement has been satisfied.

### b.  Second Element of *Terry*

The Court also finds the second *Terry* requirement to be met.  "[A]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Berry*, 664 F. App'x, at 418 (quoting *Rodriguez v. United States*, —— U.S. ——, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015)). "For instance, '[i]f all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop.' " *Id.* (quoting *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006)).  "[C]ontinued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431 (citing *United States v. Brigham*, 382 F.3d 500, 510 (5th Cir. 2004)). "A stop may only be further extended if law enforcement 'develops reasonable suspicion of additional criminal activity in the meantime.' " *Id.* (quoting *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010)).  "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431 (citing *Brigham*, 382 F.3d at 507).

In evaluating *Terry* stops, "district courts [are required] to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d at 507.  Again, "[t]he Supreme Court has long held that the touchstone of Fourth Amendment analysis is reasonableness. Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." *Id.* (citations and quotations omitted).  "Reasonableness, measured in objective terms by examining the totality of the circumstances, eschews bright-line rules, instead emphasizing the fact-specific nature of the inquiry." *Id.* (citations, alterations, and quotations omitted). The Court must "consider each of [the relevant] factors in turn" and "consider whether these factors constitute specific and articulable facts which, when considered along with whatever reasonable inferences may be drawn from them, would allow a reasonable person to suspect that [the Defendant] was engaging in illegal activity." *Lopez-Moreno*, 420 F.3d at 433 (citation omitted).  The Court must "pay heed to the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances." *Id.* (citations omitted).

"Finally, the Supreme Court has emphasized that courts must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Brigham*, 382 F.3d at 507. (citation and quotation omitted).  Courts "traditionally give due deference to the experience of officers . . . in identifying a number of factors that, although insufficient by themselves to suggest illegal activity, taken together are indicia of certain types of illicit acts.' " *Berry*, 664 F. App'x at 419 (quoting *United States v.*

*Sanchez–Pena*, 336 F.3d 431, 437 (5th Cir. 2003)). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. 1868)). "It is also clear, however, that reasonable suspicion need not rise to the level of probable cause." *Lopez-Moreno*, 420 F.3d at 430 (citing *Arvizu*, 534 U.S. at 274, 122 S. Ct. 744).

Concerning the length of the stop, in *Berry*, the Fifth Circuit explained that, " '[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " *Berry*, 664 F. App'x at 420 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)). The Fifth Circuit has "eschewed any particularized limitations on the permissible investigative tools that may be utilized in connection with a Terry stop, holding that the relevant inquiry is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Swan*, 259 F. App'x 656, 659 (5th Cir. 2007).

In the instant case, Corporal Barcelona developed additional reasonable suspicion when, in his questioning of the suspects while they were in the vehicle, he observed the unrestrained child in the backseat and marijuana in the car. Within a matter of minutes, Barcelona questioned Cloud further about the presence of contraband in the vehicle and the unrestrained infant; searched the vehicle; and then found the gun between the front seat and the console. The Court finds that the length and nature of what transpired and Barcelona's conduct were reasonable and that, as a result, there was no *Terry* violation.

### 4. Conclusion

For the above reasons, both requirements of the automobile exception apply, and there was no *Terry* violation.  Barcelona's warrantless search of the vehicle was reasonable under the totality of the circumstances, and the Defendant's motion is thus denied.

**IV.     Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress* (Doc. 16) filed by Defendant Lakeithdrick Harris is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>January 19, 2018</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**